UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ANTHONY YOUNGBLOOD,

                        Petitioner,                        **DECISION AND ORDER**

         -vs-                                                          No. 03-CV-6527

JAMES T. CONWAY, Superintendent,

                        Respondent.

_____

### INTRODUCTION

        Petitioner, Anthony Youngblood ("Youngblood"), filed this *pro se* petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Monroe County Court

on attempted murder and several lesser charges. The parties have consented to disposition of this

matter by the undersigned pursuant to 28 U.S.C. § 636(c).

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

        The conviction here at issue stems from the shooting and attempted robbery of Chester

Dortch ("Dortch") by petitioner. At about 8:30 p.m. on March 16, 2000, Officer Brian Cannon

responded to the scene of a shooting at 525 Remington Street where he found Dortch, bleeding

from the abdomen and legs. Dortch described his assailant as a black male wearing a red coat

who had taken off running, heading east through backyards. Other eyewitnesses to the shooting

described the gunman as about 5'9"-tall and 160 pounds, wearing a red ski jacket and dark pants.

These witnesses confirmed his direction of travel and stated that he was still carrying the gun.

        After setting up a perimeter around the crime scene, Officer Cannon and Officers

Anthony Bongiovanni and Patrick Carney, along with a trained tracking dog, began searching for

the suspect.  Across the street from 525 Remington, they found a set of footprints in the snow spaced widely apart. They followed the tracks south to Lang Street and then through a parking lot to Joseph and Weaver Streets, where the tracks crossed with others near a phone booth at the corner. Since it was the middle of the a snowstorm, there were not many people out and about. However, the officers spied a man who was standing in a doorway and questioned him. He stated that he had just seen someone in a red coat use the phone and then head west on Weaver Street. The officers headed in that direction and the tracking dog picked up the trail again; it led to 43 Weaver Street, specifically, the area underneath the porch. The officers observed a set of footprints leading into and out of the space behind a lattice that had been removed. There was no one under the porch, however.

The officers continued following the tracks through backyards to Farbridge Street, where one officer saw a man running eastbound; the man refused to halt when the officer called out to him. The officers split up to give chase and ultimately apprehended the man, a black male about 5'11"-tall, later identified as Youngblood. As Youngblood was being handcuffed, Officer Charles Bonafede arrived on the scene. Recognizing Youngblood from his beat on Parsells Avenue, Officer Bonafede stuck his head in the window of the patrol car where Youngblood had been placed and asked, "Hey Juke [Youngblood's nickname], how's it going? You need anything? You all set? It's been a long time since the Parsells [Avenue] days." Youngblood announced that he had been running from the police only because he had been on his way to "buy a bag of weed" and he was on parole. Without prompting, Youngblood then asked whether the police were looking for his jacket; he said that it was in the bushes of a green house near Remington and Farbridge Streets. Youngblood told them, "[T]here's nothing in it except my landlord's papers."

The police searched in the area where Youngblood indicated and discovered a jacket with a prominent red stripe in the hedges of 318 Remington Street, the only green house in the vicinity. After searching the area underneath the porch at 43 Weaver Street, the officers recovered a gun which ballistics testing revealed to be same gun that was used to shoot Dortch.

Meanwhile, Dortch was brought to Rochester General Hospital for treatment of his gunshot wounds. He described his assailant as a "dude named Juke" to Investigator Randall Benjamin. A show-up identification procedure was conducted at the hospital, and Dortch positively identified Youngblood as the gunman.

Youngblood subsequently was transported to the Public Safety Building. When Investigators Joseph Dominick and Gary Galetta arrived, they informed him of his rights under the *Miranda* decision. Youngblood agreed to speak with them without an attorney present. He initially denied any involvement in the shooting on Remington Street. Youngblood then was informed that Dortch had identified him and that the police had developed independent evidence of a connection between the two men, namely, that Youngblood had called Dortch's home before the shooting and that Dortch had dated Youngblood's aunt.

After that, Youngblood agreed to tell the officers "what happened down there." He related having contacted Dortch in order to purchase some cocaine, which he did for $200. Upon opening the bag, Youngblood discovered that the contents smelled unfamiliar, so he demanded his money back. According to Youngblood, Dortch refused to make a refund. When Youngblood grabbed him, Dortch pulled out a gun and pointed it at Youngblood. Youngblood told the officers that he disarmed Dortch using a military manoeuver, pointed the gun at him, and demanded a refund. Dortch threw some currency on the ground, but when Youngblood

discovered that it was less than the full purchase price, he became so angry that he shot Dortch. Youngblood related that when Dortch started to run away, he chased Dortch up onto the porch of a house and shot him several more times, mostly in the legs. Youngblood also told the police that he threw the gun under the porch of a house on Weaver Street and abandoned his jacket somewhere.

During a second round of questioning the next day, Youngblood admitted that he had brought the gun to the encounter between Dortch and him. He stated that he had acquired it from a person whom he knew as "Nose." Youngblood explained that he had received a page from Dortch, who proposed to meet Youngblood at the corner of Norton Street and Clinton Avenue in order to sell him cocaine. Because he believed the quality of the cocaine sold to him was suspect, Youngblood demanded a refund but Dortch refused. Dortch began to run, and Youngblood chased after him, shooting the gun. Youngblood refused to implicate the person who drove him to the meeting with Dortch. Youngblood also declined to provide a written statement memorializing any of his oral statements to the police.

A suppression hearing was held, at which Youngblood testified that the police "made up everything" they related regarding the issuance of the *Miranda* warnings and the interrogations. However, Youngblood admitted telling Officer Bonafede why he had been running. The court found that Youngblood knowingly and intelligently waived his rights and that his statements to Officer Bonafede were "spontaneously made and not the product of express questioning or its functional equivalent."

A few days before the trial court issued its decision on the suppression motion, defense counsel moved to be relieved from representing Youngblood. Counsel stated that a "rift" had

developed between them. As evidence, he pointed to Youngblood's filing of *pro se* papers, an alleged disagreement between them regarding the use of an investigator, and an implied threat by Youngblood of a malpractice suit. Youngblood did not agree that there was any such rift and he denied having threatened to bring a lawsuit. He stated that he did not want new counsel, but that if counsel were to be relieved, he wanted to represent himself. The court denied defense counsel's application, and the case proceeded to trial.

At trial, Dortch denied selling cocaine to Youngblood, but he otherwise confirmed what the police observed and what Youngblood admitted to them. At about 8:15 p.m. on March 16, 2000, Dortch received a telephone call from Youngblood, whom he knew was "Juke." Youngblood asked to meet him at a convenience store at the corner of Norton Street and Clinton Avenue in order to arrange the purchase of marijuana. Dortch, who previously had dated Youngblood's aunt, agreed.

Upon nearing the location for the scheduled meeting, Dortch saw that Youngblood had someone with him in the car. Because Youngblood promised that he would meet him alone, Dortch continued on his way. Youngblood exited the car and asked where "the guy" with the marijuana was. Dortch replied that he had been unable to contact him and began to walk away. Youngblood followed him, and the two ended up on the porch of a house on Remington Street.

Youngblood then came out from under the porch with a gun, ordered Dortch to "give it up," and shot him in the leg. This prompted Dortch to toss about $400 onto the ground, but Youngblood shot him again, hitting him in the right arm. Dortch managed to run around the house and onto the porch of the house next door. While attempting to kick in the door, he turned to face Youngblood, who was on the sidewalk. Youngblood then shot him in the stomach. Dortch

dove through a window and Youngblood ran off.

Dr. Jeff Landers, who operated on Dortch, explained that each of the four main gunshot wounds (one in each thigh, one in the knee and one in the stomach) could have caused death due to blood loss. The bullet in Dortch's stomach passed within one centimeter of the vena cava, the largest vein in the abdomen. According to Dr. Landers, most people who are shot there do not survive.

The defense called Gary Bradford ("Bradford") who testified that at about 8:45 p.m. on the night of March 16, 2000, he was in a convenience store on the corner of Cohlman and Remington Streets, chatting with Youngblood, whom he knew as "Juke Box." Youngblood told Bradford that he had just gotten out of prison and was looking for some "weed" for his sister. Bradford supplied him with some marijuana. Upon hearing police sirens they fled since they were both on parole. On cross-examination, Bradford admitted having signed a statement saying that he had sold Youngblood two "dime bags" of marijuana and that they actually had seen the police before hearing the sirens. However, at trial, Bradford stated that those things were not true.

The defense also called Mildred Scott ("Scott"), who described Youngblood as her god-brother's best friend. Scott stated that she had been with him since early that evening and drove him to a store on Cohlman Street sometime before 9:00 p.m. Scott saw him walk around the corner with "a guy with a red coat." While she waited for Youngblood, two police cars drove past. Not wanting to "be caught at a marijuana house or nothing like that," she drove away.

Submitted to the jury were the following counts as charged in the indictment: attempted murder in the first degree, robbery, assault, and criminal possession of a weapon. The court explained to the jury that it would define the crime of murder in the first degree, define "attempt

to commit a crime," and then "put them together[.]" The court defined murder in the first degree to include a homicide in which the victim was killed by the defendant in the course of committing robbery in the first degree, which it also defined. *See* N.Y. Penal Law § 125.27(1)(vii). The court defined "attempt" as conduct which comes "dangerously close" or "very close" to effecting the intended objective and combined those concepts in a charge which instructed the jury to decide whether the defendant "intended to commit the crime of murder in the first degree and . . . engaged in conduct which tended to effect the commission of that crime." However, the court did not charge the jury on attempted robbery. T.797, 823-25.[1]

During the course of their deliberations, the jury sent out a note asking whether it had to find Youngblood guilty of first degree robbery in order to convict him of attempted murder, or whether an "intended robbery" was sufficient. The prosecutor pointed out that under § 125.27(1)(a)(vii) of the Penal Law, murder in the first degree includes killing a non-participant during the course and in furtherance of a complete or attempted robbery, in any degree. The court agreed that it was "right from the statute," and instructed the jury, without objection, that an attempted robbery in the first degree would be sufficient to support a verdict of attempted murder in the first degree. T.836-43. The jury convicted Youngblood of all counts in the indictment except for the count charging first degree robbery. T.856-57. Youngblood was sentenced as a persistent felony offender and received concurrent sentences of twenty years to life on all of the convictions.

The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed the conviction. *People v. Youngblood*, 294 A.D.2d 954, 742 N.Y.S.2d 762

---

[1] Citations to "T.__" refer to the trial transcript.

(App. Div. 4th Dept. 2002). The New York Court of Appeals denied leave to appeal. *People v. Youngblood*, 98 N.Y.2d 704, 776 N.E.2d 12, 747 N.Y.S.2d 423 (N.Y. 2002). Youngblood submitted a number of collateral post-conviction application for relief, all of which were denied.

Youngblood filed a petition for federal habeas relief in this Court on October 27, 2003. *See* Docket #1. On February 12, 2004, Youngblood submitted a motion to have his petition held in abeyance while he returned to state court to exhaust certain claims. *See* Docket #11. The Court (Feldman, M.J.) granted the motion for a stay and directed Youngblood to submit a proposed amended petition. *See* Docket #16. In March 2004, Youngblood submitted an Amended Petition (Docket #17). He submitted a Supplemental Amendment of Petition (Docket #18) in April 2004. Youngblood submitted additional documents in further support of his amended claims to the Court on November 1, 2005. *See* Docket ##24-1, 24-2, 24-3, 24-4.  The following documents appear to be Youngblood's proposed amendments to the original petition: Docket ##17, 18, 24-1, 24-2, 24-3 and 24-4. Respondent has submitted a supplemental answer and memorandum of law in opposition to these new pleadings. *See* Docket ##25-1, 25-2, 25-3. Youngblood filed a reply to respondent's pleadings on January 27, 2006. *See* Docket #26. As the matter is now fully briefed and ready for decision, the Court orders that the stay is hereby lifted. For the reasons set forth below, the petition is denied.

## DISCUSSION

### Amendment to Petition

By statute, a writ of habeas corpus "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242. Rule 15 of the Federal Rules of Civil Procedure governs motions to amend petitions for habeas corpus. *See Littlejohn v. Artuz*,

271 F.3d 360, 363 (2d Cir. 2001); *Ching v. United States*, 298 F.3d 174, 180-81 (2d Cir. 2002);

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts. Rule

15(c)'s relation-back provision "governs the timeliness of a motion to amend submitted after

AEDPA's statute of limitations has expired." *Ching*, 298 F.3d at 181. Arguably, most, if not all,

of Youngblood's new claims do not relate back to the original petition because there is nothing in

the original habeas corpus petition which would have given respondent fair notice of the newly

alleged claims. If petitioner's proposed amendments are deemed not to relate back, then the new

claims would constitute new petitions, and, to have the new claims heard despite the one-year

statute of limitations, petitioner would have to show that they were brought within one year of

"the date on which the factual predicate of the . . . claims presented could have been discovered

through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). However, respondent has not

addressed the relation-back issue and instead argues the merits of petitioner's original and

proposed additional claims.

Given this rather muddled state of affairs, and respondent's failure to address the

ramifications of Rule 15(c), this Court believes that "the simplest and wisest course is to slice

through the tangles in a different direction." *Newton v. Coombe*, No. 95 CIV. 9437 GEL, 2001

WL 799846, at *10 (S.D.N.Y. July 13, 2001); *accord Williams v. Donnelly*, Nos.

00-CV-4445DGT, 00-CV-4447DGT, 00-CV-4448DGT, 2005 WL 2290592, at *29 (E.D.N.Y.

Apr. 12, 2005). In keeping with the approach taken by the Second Circuit in *Fama v.*

*Commissioner of Correctional Services*, 235 F.3d 804, 816 (2d Cir. 2000), as well as by various

district courts within this circuit, this Court will grant petitioner's motion to amend the petition

and address and dispose of petitioner's proposed new claims on the merits. *See Newton*, 2001

WL 799846, at *10 ("Assuming *arguendo*, as the Court of Appeals did in *Fama*, that the proposed amendment would relate back to the filing of the original petition, and pretermitting the exhaustion issue, as permitted by 28 U.S.C. § 2254(b)(2) in dealing with meritless petitions, the petition must nevertheless be denied, because petitioner's new claim[s] do[ ] not justify habeas relief."); *accord Williams*, 2005 WL 2290592, at *29 (citations omitted).

With respect to the exhaustion issue, respondent states in its supplemental answer, "We believe that the petitioner has exhausted each claim raised in his collateral motions. However, if District Court should find otherwise, we do not waive the exhaustion requirement." Respondent makes no further argument regarding the defense of non-exhaustion and, by addressing all of petitioner's claims on the merits, treats them as exhausted. The Court observes that it is respondent's burden to assert any affirmative defenses to petitioner's claims; the Court is not in the business of making respondent's arguments for it. Respondent's statement in its supplemental answer thus will be treated as a waiver of the exhaustion requirement.

**<u>Standard of Review</u>**

To prevail under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

**<u>Merits of the Petition</u>**

-10-

1.      *Miranda* **claim**

Youngblood contends that the trial court erred in denying the suppression of his

statements made in the police car and at the police station because he was not given the *Miranda*

warnings upon his arrest or prior to his being questioned. *See* Amended Petition at 7, ¶22A

(Docket #24-4). On direct appeal, the Fourth Division rejected this claim:

> County Court properly refused to suppress the initial statements of defendant to
> the police, made before he received *Miranda* warnings. Questions that are
> necessary for processing a suspect or providing for his physical needs need not be
> preceded by *Miranda* warnings because such questions do not constitute
> interrogation. Further, the court properly found that defendant's statements, which
> were nonresponsive to the officer's inquiry, were spontaneous and not the product
> of interrogation.

*People v. Youngblood*, 294 A.D.2d at 954, 742 N.Y.S.2d at 763 (citations omitted).

a.      **Initial statements of petitioner**

In *Pennsylvania v. Muniz*, 496 U.S. 582, 600-02 (1990), Justice Brennan, writing for a

plurality of the Supreme Court, explained that routine booking or "pedigree" questions are

reasonably related to police record-keeping concerns and therefore fall outside *Miranda*

protections and need not be suppressed.  *See id.* at 601-02.  The plurality cautioned, however,

that police may not ask questions designed to elicit incriminatory admissions at the booking stage

without giving *Miranda* warnings. *See id.* at 602 n.14; *see also United States v. Adegbite*, 846

F.2d 834, 848 (2d Cir. 1988), *after remand*, 877 F.2d 174, 179 (2d Cir. 1989), *cert. denied*, 493

U.S. 956 (1989); *United States ex rel. Hines v. LaVallee*, 521 F.2d 1109, 1112-13 (2d Cir. 1975),

*cert. denied*, 423 U.S. 1090 (1976).  Thus, the prosecution may not rely on the pedigree

exception if the questions, although facially appropriate, are likely to elicit incriminating

admissions because of the circumstances of the particular case.  *See*, *e.g.*, *United States v.*

*Minkowitz*, 889 F. Supp. 624, 627 (E.D.N.Y. 1995) (citing *Thompson v. United States*, 821 F.

Supp. 110, 120 (W.D.N.Y. 1993) ("[T]he booking exception is not absolute.")); *Muniz*, 496 U.S.

at 602 n.14).  In determining whether the challenged information "falls within the benign

category of 'basic identifying data required for booking and arraignment,'" *United States v.*

*Gotchis*, 803 F.2d 74, 79 (2d Cir. 1986) (quoting *Hines*, 521 F.2d at 1113), the court should also

consider whether the inquiry was "innocent of any investigative purpose[.]" *United States v.*

*Carmona*, 873 F.2d 569, 573 (2d Cir. 1989).  Both the content and context of the inquiry inform

the court's determination; the "'relationship of the question asked to the crime suspected is

highly relevant.'" *Minkowitz*, 889 F. Supp. at 627-28 (quoting *United States v. Mata-Abundiz*,

717 F.2d 1277, 1280 (9th Cir. 1983) (alien arrested on state firearms charges was improperly

interrogated by INS agent about his alien status where element of crime charged was defendant's

citizenship)).

    The questions by Officer Bonafede to Youngblood while he was in the police car to the

effect of "how are you doing?" were, as the appellate division found, not "designed to elicit

incriminatory admissions" by Youngblood. Moreover, Youngblood's answer was spontaneously

volunteered and not even responsive to the officer's question. Under these circumstances, where

the suspect's statements are volunteered and not made in response to express questioning or its

functional equivalent, the *Miranda* protections are not implicated. *See Rhode Island v. Innis*, 446

U.S. 291, 299-302 (1980) (stating that *Miranda* protections apply only when statements are made

in response to express questioning or its functional equivalent); *Miranda v. Arizona*, 384 U.S.

436, 478 (1966) (holding that "[v]olunteered statements of any kind are not barred by the Fifth

Amendment and their admissibility is not affected by our holding today"); *cf. United States v.*

*Colon*, 835 F.2d 27, 30 (2d Cir. 1987) (stating that once suspect invokes *Miranda* right to remain

silent, any statements to police must be spontaneous and not the result of interrogation in order to

be admissible), *cert. denied*, 485 U.S. 980 (1988) (citation omitted); *Wolfrath v. LaVallee*, 576

F.2d 965, 973 n.6 (2d Cir. 1978) ("[S]ince the statement which was litigated below was a

gratuitously volunteered statement, *Miranda* itself is inapplicable, for spontaneous statements

which are not the result of "official interrogation" have never been subject to its strictures.)

(citations omitted).

> **b.**     **Statements during police questioning**

In support of his claim that he was not issued the *Miranda* warnings at any time on the

night of his arrest, Youngblood offers only his own testimony at the suppression hearing

categorically denying that the police did not read him his rights. The state appellate court found

that the trial court

> properly denied suppression of the statements subsequently made by defendant at
> the Public Safety Building. The interrogating officers testified that defendant was
> given his *Miranda* warnings and explicitly waived them before speaking with the
> officers. They further testified that defendant never requested counsel and that no
> promises or threats were made by the officers. The determination of the
> suppression court, particularly its assessment of the witnesses' credibility, is
> entitled to great deference and will not be disturbed where, as here, it is supported
> by the record.

*People v. Youngblood*, 294 A.D.2d at 954 (citations omitted).

These factual findings by the state courts are entitled to a presumption of correctness

which the habeas petitioner must rebut by "clear and convincing evidence." 28 U.S.C. §

2254(e)(1). Apart from his assertions at the suppression hearing that he was not read his *Miranda*

rights, Youngblood has offered no new evidence to rebut the presumption of correctness that

attaches to the state court's findings of fact. This is plainly insufficient to carry his burden under

§ 2254(e)(1). Consequently, this claim affords no basis for habeas relief.

**2.      Arrest was without probable cause**

Youngblood claims that the trial court violated his Fourth Amendment rights when it

found that the police had probable cause to arrest him; Youngblood asserts that he did not match

the description of the shooter provided by the victim. *See* Amended Petition at 8 (Docket #24-4).

The Supreme Court has explicitly held that Fourth Amendment claims that have been litigated in

state court are not cognizable on habeas review:

> [W]here the State has provided an opportunity for full and fair litigation of a
> Fourth Amendment claim, a state prisoner may not be granted federal habeas
> corpus relief on the ground that evidence obtained in an unconstitutional search or
> seizure was introduced at his trial. In this context the contribution of the
> exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal,
> and the substantial societal costs of application of the rule persist with special
> force.

*Stone v. Powell*, 428 U.S. 465 (1976); *accord Capellan v. Riley*, 975 F.2d 67, 69-71 (2d Cir.

1992); *Grey v. Hoke*, 933 F.2d 117, 121 (2d Cir. 1991). Here, Youngblood litigated his Fourth

Amendment claim at the pretrial suppression hearing and on direct appeal to the Appellate

Division. Thus, state corrective process was not only available to petitioner but was utilized by

him in seeking redress for his Fourth Amendment claim. Therefore, the claim cannot support a

petition for a writ of habeas corpus. *See*, *e.g.*, *Gandarilla v. Artuz*, 322 F.3d 182, 185 (2d Cir.

2003) ("[T]he merits of a Fourth Amendment challenge are not reviewable in a federal habeas

proceeding if a defendant has had a fair opportunity to litigate that question in State court . . . .");

*Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002) ("[O]nce it is established that a petitioner

has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she

took advantage of the state's procedure), the [state] court's denial of the claim is a conclusive

determination that the claim will never present a valid basis for federal habeas relief."").

Accordingly, Youngblood's Fourth Amendment claim must be dismissed.

**3.      Erroneous introduction of evidence**

Youngblood contends that the "[t]estimony of witness/victim should have been rejected

due [to] many inconsistencies." Amended Petition at 6 (Docket #17). He claims that Dortch, the

victim, "testified that he seen [*sic*] and spoke to the defendant in the early seasons of 1999, but

this was very impossible because the defendant was incarcerated in a State Prison from 1997-

October 27, 1999." *Id.* This claim is without merit.

It is a well-settled tenet of both New York state and federal law that the inconsistencies in

a prosecution witness's testimony go not to the admissibility of his or her testimony but to the

weight to be given to it. *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979) (holding that

several "serious" inconsistencies in the witnesses' testimony were not "were such as to take the

case away from the jury, under the totality of the circumstances") (citations omitted); *see also*

*People v. Gruttola*, 43 N.Y.2d 116, 122, 400 N.Y.S.2d 788 (N.Y. 1977) ("Issues of credibility

are primarily for the jury[.]") (citations omitted); *People v. Royall*, 172 A.D.2d 703, 703-04, 568

N.Y.S.2d 30 (App. Div. 2d Dept. 1991) ("Contrary to the defendants' contentions, the unsavory

character of the only witness to identify both defendants, the witness's previous recantation of

that identification, and the fact that he testified pursuant to a plea agreement, did not necessarily

render his testimony incredible."); *Barefoot v. Estelle*, 463 U.S. 880, 902 (1983) (agreeing with

district court that "it is a fundamental premise of our entire system of criminal jurisprudence that

the purpose of the jury is to sort out the true testimony from the false, the important matters from

the unimportant matters, and, when called upon to do so, to give greater credence to one party's expert witnesses than another's). This Court cannot substitute its judgment for that of the jury's with regard to the credibility of prosecution witness Dortch. Accordingly, this claim offers no basis for habeas relief.

**4.      Ineffective assistance of trial counsel**

Youngblood asserts that "trial counsel was ineffective by not objecting to issues that were meritorous [*sic*], trial counsel did not investigate and research the case of the defendant, nor did he explain to the jury or court the untruthfulness of the prosecutor's witness on events that could not have taken place." Amended Petition at 8 (Docket #24-4).

**a.      Legal standard**

A defendant claiming that he was deprived his Sixth Amendment right to the effective assistance of counsel at his trial must first demonstrate that his counsel's performance "fell below an objective standard of reasonableness" in light of "prevailing professional norms," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and then "affirmatively prove prejudice" arising from counsel's allegedly deficient representation, *id.* at 693. A petitioner "bears a heavy burden" under *Strickland*'s two-pronged test. *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004).

**b.      Alleged grounds of ineffectiveness**

With regard to the first claim regarding the failure to "object to meritorious issues," the Court notes that petitioner has not identified which specific, meritorious issues counsel failed to preserve by objecting to them. As such, this claim is too vague to state a proper claim for relief. Turning to the claim that defense counsel did not properly investigate petitioner's case, the Court observes again that petitioner has not offered any specific basis for this claim; he has not

identified potential witnesses that counsel failed to interview or exculpatory evidence that counsel failed to unearth. Thus, this claim also is too vague to state a claim for relief. Finally, petitioner's claim that trial counsel did not properly attack the credibility of the prosecution's witnesses is unfounded. Counsel vigorously cross-examined the prosecution's witnesses and argued credibility issues presented by their testimony to the jury.

**5.    Ineffective assistance of appellate counsel**

      **a.    Legal standard**

Although the *Strickland* test was formulated in the context of evaluating the effectiveness of trial counsel, the same standard applies to claims regarding the performance of appellate counsel. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citing, *e.g.*, *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992)). Appellate counsel need not present every nonfrivolous argument that could be made on petitioner's behalf.  *Mayo*, 13 F.3d at 533; *see also Evitts v. Lucey*, 469 U.S. 387, 394 (1985) (emphasizing that appellate counsel "need not advance every argument, regardless of merit, urged by the appellant"). Moreover, reviewing courts should not employ hindsight to second-guess an appellate attorney's strategy choices.  *Mayo*, 13 F.3d at 533; *see also Jones v. Barnes*, 463 U.S. 745, 754 (1984) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the [ ] goal of vigorous and effective advocacy[.]").

      **b.    Alleged grounds of ineffectiveness**

            **i.    Failure to argue that the verdict was repugnant**

Youngblood contends that appellate counsel was ineffective for failing to argue that the verdict for first degree attempted murder was "repugnant" on the basis that he was "convicted of

an offense containing an essential element that the jury . . . found defendant did not commit."
Supplemental Amendment of Petition at 2 (Docket #18). Youngblood argues that the prosecution
needed to prove the underlying felony of first degree robbery in order to find him guilty of
attempted first degree murder. *Id.* He reasons that because he was not found guilty of first degree
robbery, as charged in the indictment, he could not have been found guilty of attempted first
degree murder. *Id.*

      Here, however, the trial court correctly charged the jury that attempted murder in the first
degree could be predicated on *either* an underlying robbery or attempted robbery of the victim.
*People v. Youngblood*, 294 A.D.2d at 954 (citing N.Y. Penal Law § 125.27(1)(a)(vii)).  Thus,
because the trial court gave the jury the option of using attempted robbery as the underlying
felony, the acquittal of petitioner on the robbery charge, which was the underlying felony upon
which the attempted murder count was based, did not result in a repugnant verdict. *People v.
Gary*, 162 A.D.2d 277, 556 N.Y.S.2d 872 (App. Div. 1st Dept. 1990) (holding that conviction of
defendant on robbery charge, which was underlying felony upon which second degree assault
count was based, did not result in a repugnant verdict because verdict "was not at odds with the
trial court's charge to the jury, which gave the jury the option of basing the conviction for second
degree assault on a finding that defendant caused physical injury to the complainant in the
furtherance of an attempt to rob him").  As courts in New York have noted, "It matters not how
the jury reached its verdict or even if the verdict is logically inconsistent provided the verdict is
not at odds with the charge[.]" *People v. Hankinson*, 119 A.D.2d 506, 508, 501 N.Y.S.2d 36
(App. Div. 1st Dept. 1986) (cited in *Gary*, 162 A.D.2d at 277). Because petitioner's repugnant
verdict claim is not likely to have been successful on appeal, petitioner was not prejudiced by

appellate counsel's failure to include this issue in his brief.

### ii.     Failure to argue that trial counsel was ineffective by failing to object to denial of relief requested in C.P.L. § 330 motion

Youngblood contends that "[a]ppellate counsel failed to raise that the trial counsel was ineffective by not objecting to the State court[']s denial on the repugnancy of the Attempt Murder charge in the 330 Motion hearing[.]" Amendment to Petition at 6 (Docket #18); Amended Petition at 9 (Docket #24-4). It is not entirely clear to the Court what Youngblood is arguing. However, as discussed above, the verdict was not inconsistent with the judge's charge on the law to the jury. Thus, any alleged omissions by trial counsel with regard to this meritless claim did not prejudice petitioner. Furthermore, appellate counsel did not act unreasonably in omitting the claim on appeal.

### iii.    Failure to argue that trial counsel was ineffective for failing to object to a jury instruction

According to Youngblood, trial counsel was ineffective for failing to object to the court's charge to the jury with respect to the attempted murder count. *See* Amended Petition at 9 (Docket #24-4). Presumably, Youngblood is referring to the first version of the charge, in which the trial court neglected to fully explain that attempted robbery could constitute the predicate felony to support a conviction of first degree attempted murder. Neither defense counsel nor the prosecutor objected to this incomplete charge. During deliberations, the jury requested clarification on this point, and the court then reissued its charge correctly, instructing the jury that either an attempted robbery or a completed robbery could form the basis for attempted first degree murder. Certainly, the court's original charge was more favorable to petitioner because it instructed the jury (albeit incorrectly) that a completed robbery was a necessary predicate for a conviction of first degree

attempted murder. Thus, it arguably was not unreasonable for defense counsel not to object to the first charge. In any event, even if he should have objected, his omission to do so was mooted by the trial court's subsequent correction of the charge.

### iv.    Failure to argue that trial counsel did not object to trial court's refusal to allow him to withdraw his representation

Youngblood argues that appellate counsel was ineffective for failing to argue that trial counsel was deficient in failing to "object to denial of request to be relieved from the petitioner[']s case due to conflict of interest." Amended Petition at 9 (Docket #24-4); Amendment to Petition at 9 (Docket #18). The conflict of interest, according to Youngblood, was apparent when "the trial attorney informed the courts of specific difficulties that had arisen between him and the petitioner and also established a breakdown of communication and lack of trust[.]" Amendment to Petition at 9 (Docket #18). However, given Youngblood's representations on the record to the trial court that he did not have an issue with defense counsel and that he did not want counsel to be relieved from representing him, this claim seems rather disingenuous. In any event, there is no evidence trial counsel had a conflict of interest which would have made his continued representation of Youngblood improper.

### v.    Failure to argue that petitioner was coerced into pleading guilty

Youngblood contends that appellate counsel should have argued that petitioner erroneously was "persuaded to plea[d] guilty to a felony charge when in fact it was a misdemeanor[.]" Amended Petition at 9 (Docket #24-4). Review of the papers submitted to the courts below reveals that this contention relates to a conviction dating back to 1990 in which Youngblood pled guilty to third degree criminal possession of a weapon. Even if a claim relating

to a conviction from 1990 were still timely, which the Court expressly finds not to be the case, *see* 28 U.S.C. § 2244(d), it has nothing to do with the conviction from 2002 at issue in this habeas petition and is not properly before this Court.

### vi.  Deficient performance with respect to the attempted murder charge

Youngblood rather cryptically asserts that "Appellate Counsel did not raise an adequate argument of [*sic*] the Attempt[ed] Murder charge." Amended Petition at 9 (Docket #24-4). Based on its review of the Amendment to Petition, the Court construes this to be a claim that either appellate counsel failed to argue that the attempted murder jury charge was incorrect as a matter of law or that there was insufficient evidence to support the conviction. *See* Amendment to Petition at 4 *et seq.* (Docket #18).

With regard to the adequacy of the jury charge, it appears to have been proper, as the state appellate court found. As to the insufficiency of the evidence claim, the Court notes that the state appellate court explicitly found that the attempted murder conviction was not against the weight of the evidence, a standard which is a considerably less deferential to the trier of fact as compared to the insufficiency-of-the-evidence inquiry. *See People v. Bleakley*, 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761 (N.Y. 1987) ("To determine whether a verdict is supported by the weight of the evidence, however, the appellate court's dispositive analysis is not limited to that legal test [*i.e.*, whether the evidence was legally sufficient]. Even if all the elements and necessary findings are supported by some credible evidence, the court must examine the evidence further. If based on all the credible evidence a different finding would not have been unreasonable, then the appellate court must, like the trier of fact below, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the

testimony[.]") (internal quotation marks and citations omitted).

"A habeas petitioner challenging the sufficiency of the evidence supporting his conviction bears a heavy burden." *Knapp v. Leonardo*, 46 F.3d 170, 178 (2d Cir. 1995), *cert. denied*, 515 U.S. 1136 (1995). The standard is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Fiore v. White*, 531 U.S. 225, 229 (2001) (holding that "the Fourteenth Amendment forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt").

Thus, in reviewing the sufficiency of the evidence against Youngblood, this Court must first look to the relevant state law to determine the elements of the crime. *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002). Where facts presented at trial support conflicting inferences, the Court must presume that conflicts were resolved in favor of the prosecution. *Jackson*, 443 U.S. at 326. In making its assessment, the Court must "credit every inference that could have been drawn in the state's favor . . . whether the evidence being reviewed is direct or circumstantial." *Reddy v. Coombe*, 846 F.2d 866, 869 (2d Cir. 1988). Moreover, the Court may not disturb "reasonable inferences [drawn by the jury] from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

Youngblood contends that the infliction of wounds on the victims arms, legs, and lower stomach were "inconsistent with lethal strikes[.]" Amendment to Petition at 4 (Docket #18). Thus, Youngblood contends, he could not be found to have possessed the requisite intent to kill. At trial, prosecution presented evidence that petitioner shot the victim, who was facing him at the

time, in the stomach, and that the bullet came within one centimeter of piercing the victim's vena cava and causing almost certain death. A rational jury could have concluded that, based on these facts, petitioner intended to do more than just wound the victim. In other words, there is a valid line of inferences that could be drawn from the facts presented at trial and could lead a rational jury to conclude that petitioner possessed the requisite intent to kill.

### vi. Failure to argue that trial counsel was ineffective in not requesting a *Rodriguez* hearing

Youngblood argues that appellate counsel was deficient in failing to argue that trial counsel erred in not requesting a hearing pursuant to *People v. Rodriguez*, 79 N.Y.2d 445, 583 N.Y.S.2d 814, 593 N.E.2d 268 (N.Y. 1992).  The purpose of a *Rodriguez* hearing is to establish that an identification is confirmatory when the court denies a request for a *Wade*[2] hearing that basis. *See Rodriguez*, 79 N.Y.2d at 449-450; *accord People v. Quinones*, 5 A.D.3d 1093, 773 N.Y.S.2d 671 (App. Div. 4th Dept. 2004). Where, as here, the trial court conducts a *Wade* hearing, there is no requirement that a *Rodriguez* hearing also be conducted.  *Quinones*, 5 A.D.2d at 1093 (citing *People v. Goico*, 303 A.D.2d 1030, 756 N.Y.S.2d 816 (App. Div. 4th Dept. 2003)). Because the court conducted a *Wade* hearing, trial counsel had no legal basis for requesting a hearing pursuant to *People v. Rodriguez*. Thus, because such a request in all likelihood would have been denied, petitioner was not prejudiced by trial counsel's omission in this regard. And, because there is no reasonable likelihood that this non-meritorious claim would have succeeded on direct appeal, petitioner was not prejudiced by appellate counsel's failure to include it.

---

[2] *United States v. Wade*, 388 U.S. 218 (1967).

**6.      Sentencing claims**

**a.      Violation of *Apprendi***

Youngblood argues that his adjudication as a persistent violent felony offender denied

him due process of law "where the existence of the prior convictions was neither submitted to a

jury, nor contained in the indictment." *See* Docket #24-4 at 10, ¶2. Youngblood contends that the

sentencing court violated the Supreme Court's holding in *Apprendi v. New Jersey*, 530 U.S. 466

(2000).

In *Apprendi*, the Supreme Court held as follows: "*Other than the fact of a prior

conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory

maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490

(emphasis added). *Apprendi* clearly is inapplicable on its face to a challenge, such as the one

urged by Youngblood here, to an increased sentence based on prior convictions. Indeed, in all

post-*Apprendi* decisions in which an enhanced sentence was based on a prior conviction or

convictions, the courts have held such a sentence to be valid under *Apprendi*. *Green v. Herbert*,

No. 01CIV.11881SHSAJP, 2002 WL 1587133, at *20 (S.D.N.Y. July 18, 2002) (citing, *inter

alia United States v. Anglin*, 284 F.3d 407, 409-11 (2d Cir. 2002); *United States v.

Calderon-Villeda*, No. 01-1402, 2002 WL 535051 at *1 (2d Cir. Apr.10, 2002); *United States v.

Pimentel*, 27 Fed. Appx. 15, 16, 2001 WL 1178804 at *1 (2d Cir. Oct. 3, 2001); *United States v.

Latorre-Benavides*, 241 F.3d 262, 263-64 (2d Cir.), *cert. denied*, 532 U.S. 1045 (2001)).

In any event, the prosecutor questioned Youngblood about his two prior felony

convictions, and Youngblood admitted that he was the person so convicted:

Mr. Bernstein:          Now are you the same individual that had that conviction

-24-

| | [for criminal possession of a weapon in the third degree] back on January 31st, 1990. |
|---|---|
| The Defendant: | Yes, I had six months probation. |
| . . . | |
| Mr. Bernstein: | But you admit that you are the same person that had that conviction? |
| The Defendant: | Hm-hmm. |
| Mr. Bernstein: | All right. Going to the second charge . . . . [Y]ou ultimately were found guilty [by a jury] of Assault in the Second Degree . . . . [Y]ou appeared before Judge Wisner again, and he sentenced you on May 1st 1997 as a second felony offender finding that's your first conviction of Criminal Possession of a Weapon in the Third Degree. |
| The Defendant: | It was nonviolent. |
| Mr. Bernstein: | It was a predicate. . . . Are you the same individual that was convicted of that by a trial of a jury? |
| The Defendant: | Yes. |

S.35-36.[3] Youngblood then stated that he was not guilty of the 1997 assault charge, as evidenced by the fact that his co-defendant pled guilty to it. Notwithstanding his protestations of innocence, Youngblood clearly admitted that he was the same Anthony Youngblood convicted of criminal possession of a weapon in 1990 and second degree assault in 1997. These admissions thereby mooted any *Apprendi* issue even if *Apprendi* applied to prior convictions. *Id.* (citing *United States v. Champion*, 234 F.3d 106, 109-10 & n. 3 (2d Cir. 2000) ("[A]t trial, [defendant] stipulated to the quantity of drugs involved in his crime. . . . Under the stipulation, a jury could not have found differently" and, therefore, "the fact that the judge, at sentencing" used the stipulated quantity to sentence defendant did not constitute an *Apprendi* violation.); *cf.*, *e.g.*, *Hargrett v. United States*, No. 01-CV-1046, 2002 WL 1343469, at *2 (N.D.N.Y. June 14, 2002) ("[W]hen the defendant admits the quantity of drugs for which he is accountable," in his plea allocution, "*Apprendi* is satisfied and does not limit the sentence which may be imposed.");

---

[3]  Citations to "S.__" refer to the transcript of the sentencing hearing.

*Carmona v. United States*, No. 01-CV-0286, 2001 WL 761169 at *2 (E.D.N.Y. Apr. 25, 2001);

*Jimenez v. United States*, 168 F. Supp.2d 79, 83 (S.D.N.Y.2001)).

**b.      Failure to hold hearing**

Youngblood contends that he should have been given a hearing "on the challenges of the constitutionality of a prior conviction for the purpose of a predicate or persistent felony sentence." Amended Petition at 10 (Docket #24-4).Youngblood apparently is arguing that, at the sentencing hearing held on December 8, 2000, he should have been given another full-blown hearing regarding the constitutionality of his 1990 weapons-possession conviction and 1997 assault conviction. However, as discussed above, Youngblood admitted that he was the same individual named in the two certificates of conviction. Furthermore, as Judge Geraci noted at the December 2000 hearing, there was a full hearing held in 1997 regarding all of petitioner's constitutional challenges to the prior convictions after which Judge Wisner found that petitioner was a second felony offender based on the weapons possession conviction and the assault conviction. S.38-39. Judge Geraci explained that he was "bound by that determination regardless of the defendant's indication at this point that he did not commit those offenses, . . . and similarly denies that he was convicted of those prior charges." S.39.[4]

Under New York state law, Judge Geraci was not obligated to hold another hearing. *See*, *e.g.*, *People v. Alston*, 1 A.D.3d 627, 630, 766 N.Y.S.2d 724 (App. Div. 3d Dept. 2003). In *Alston*, the defendant was sentenced as a second felony offender for his second predicate conviction, namely, a 1995 conviction, based upon an earlier 1990 felony. The court stated, "The

---

[4]  This Court respectfully disagrees with Judge Geraci's characterization of petitioner's testimony at the hearing. Although petitioner denied committing the offenses, he did concede that he was the individual so convicted.

validity of the 1990 conviction thus established, it is now binding in this subsequent proceeding

and not subject to constitutional challenge[.]" *Id.* (citing, *inter alia*, N.Y. Crim. Proc. Law §

400.21(8) ("Subsequent use of a predicate felony conviction finding. Where a finding has been

entered pursuant to this section, such finding shall be binding upon that defendant in any future

proceeding in which the issue may arise."). Even if Youngblood had been granted a hearing to

challenge his prior felony convictions on the ground that the convictions were unconstitutionally

obtained, the outcome would have been the same. This is because "it is incumbent upon [the

defendant] to prove the facts underlying his claim[.]" N.Y. Crim. Proc. Law § 400.21(7)(b);

*People v. Harris*, 61 N.Y.2d 9, 15, 471 N.Y.S.2d 61 (N.Y. 1983). Beyond Youngblood's

conclusory assertions of innocence, he offered nothing substantive in the way of a constitutional

challenge to those prior convictions. Habeas relief is not warranted on this claim.

    **c.  Sentence was invalid as a matter of law**

   Youngblood states that "[b]y law a fire arm found in one[']s home/work place is a lesser

charge (misdemeanor). The defendant was charged with a felony gun possession when in fact the

gun was found in the defendant[']s home/work place under the living room couch." Amended

Petition at 8 (Docket #17). It is apparent that this argument relates to Youngblood's conviction in

1990 by a plea bargain to one charge of criminal possession of a weapon. As discussed above,

even if a claim relating to a conviction from 1990 were still timely, which the Court expressly

finds not to be the case, *see* 28 U.S.C. § 2244(d), it has nothing to do with the conviction from

2002 at issue in this habeas petition and is not properly before this Court.

**7.  Prosecutorial misconduct**

   Youngblood contends that the prosecutor committed misconduct when he "allowed"

Dortch, the victim, "to lie about events and issues he knew were to be false[.]" Amended Petition at 8 (Docket #18). He also contends that the prosecutor engaged in misconduct when he "allow[ed] the witness [Dortch] to see the gun and defendant[']s coat in his office a few days before trial[.]" *Id.*  According to Youngblood, the gun was in a sealed envelope which prosecutor improperly opened.

A prosecutor "has a duty to refrain from eliciting and relying upon testimony known to be perjurious." *United States v. Gaggi*, 811 F.2d 47, 59 (2d Cir. 1987) (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (*per curiam*)). "[T]o challenge a conviction because of a prosecutor's knowing use of false testimony, a defendant must establish that (1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Helmsley*, 985 F.2d 1202, 1205-06 (2d Cir. 1993) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)); *see also United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (citations omitted). As respondent points out, Youngblood does not provide any evidence to support his claim that Dortch lied on the stand; for instance, he does not specifically identify the topics about which Dortch purportedly lied. Nor does Youngblood explain how the prosecutor knew, or should have known, that his key witness was lying. As this claim is based on nothing more than mere speculation, it cannot provide a basis for habeas relief.

Youngblood's claim about the victim being shown certain items of physical evidence before trial appears to be more of a chain-of-custody argument than a prosecutorial misconduct claim. Even so, Youngblood has not articulated any rule that precludes a witness being shown items of physical evidence before testifying. Nor has he shown that the prosecutor's actions were

improper any way. Again, this claim is purely speculative and affords no basis for habeas relief.

## CONCLUSION

For the reasons stated above, petitioner Anthony Youngblood's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:        April 11, 2006
             Rochester, New York.